# EXHIBIT A

2025 WL 2319550
Only the Westlaw citation is currently available.
United States Court of Appeals,
District of Columbia Circuit.

Nicole PILEGGI, individually and on behalf
of others similarly situated, Appellant
v.
WASHINGTON NEWSPAPER
PUBLISHING COMPANY, LLC, Appellee

No. 24-7022
|
Argued February 27, 2025
|
Decided August 12, 2025

Appeal from the United States District Court for the District of Columbia (No. 1:23-cv-00345)

**Attorneys and Law Firms**

Joshua I. Hammack argued the cause for appellant. On the briefs was Michael A. Caddell.

Grace W. Knofczynski argued the cause for appellee. With her on the brief were Scott H Angstreich and Andrew Skaras. Mark C. Hansen entered an appearance.

Before: Millett and Wilkins, Circuit Judges, and Randolph, Senior Circuit Judge.

**Opinion**

Concurring opinion filed by Senior Circuit Judge Randolph.

Millett, Circuit Judge:

\*1 The Video Privacy Protection Act was passed in 1988 to deter the disclosure to any person of private video tape rental records. Thirty-seven years later, the question before this court is how that statute applies to online videos.

After signing up to receive the *Washington Examiner's* newsletter, Ms. Pileggi chose to visit the *Washington Examiner's* website. Unbeknownst to Ms. Pileggi, a piece of computer code called the "Meta Pixel" transmitted to Meta information about the videos she watched on the website. She sued the *Washington Examiner's* owner, Washington Newspaper Publishing Company, for violating the Video Privacy Protection Act.

The Video Privacy Protection Act defines a consumer protected by the statute as "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(l). The district court held that Ms. Pileggi is not a "consumer" within the meaning of the Act because she did not sufficiently allege the requisite connection between the newsletter for which she had registered and the private information transmitted to Meta. Ms. Pileggi's choice of videos to view on the website was the only information disclosed to Meta, and she did not use the newsletter to access the website or its videos.

On appeal, Ms. Pileggi argues that a plaintiff does not need to subscribe to a video to have a cause of action under the Video Privacy Protection Act. According to Ms. Pileggi, any plaintiff who purchases, rents, or buys any "good or service" from a third party and then later watches an unrelated video provided by that party has a cause of action under the Act. Ms. Pileggi also renews her argument that the newsletter constitutes a sufficient connection to the videos on the website for her to be a consumer.

We affirm the district court's dismissal of Ms. Pileggi's complaint. To state a claim under the Video Privacy Protection Act, a plaintiff must allege that: (1) she purchased, rented, or subscribed to a video cassette tape or similar audio-visual good or service, (2) the video tape service provider collected personally identifiable information about that audio-visual good or service, and (3) that private information was disseminated to a third party without her consent.

I

A

The Video Privacy Protection Act ("Video Privacy Act") traces its origins to the 1987 nomination of Judge Robert Bork of the United States Court of Appeals for the District of Columbia Circuit to the Supreme Court. During the confirmation process, a journalist obtained records of Judge Bork's video rentals and published details about them. Michael Dolan, *The Bork Tapes,* WASHINGTON CITY PAPER (Sep. 25, 1987), https://perma.cc/37V2-T2ZD.

While Judge Bork's rental history contained only innocuous titles like Hitchcock classics and James Bond thrillers, Members of Congress from both parties reacted strongly to this disclosure. *See Nomination of Robert H Bork to be Associate Justice of the Supreme Court of the United States Before the S. Comm. on the Judiciary,* 100th Cong. 2819 (1987) ("*Judiciary Hearing*") (statement of Sen. Biden) ("Quite frankly, I think it is reprehensible * * * that a Supreme Court nominee would have someone going down and looking at what videos he or she rented."); 134 Cong. Rec. 31842 (1988) (statement of Rep. Moorhead) ("Both the Democrats and the Republicans deciding upon Judge Bork's judgeship became outraged and called for legislation.").

**\*2** Congress quickly responded with the Video Privacy Act. The Act's purpose is to "preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials[.]" S. REP. No. 100-599, at 1 (1988). To that end, the statute renders civilly liable any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1). The Video Privacy Act defines a "video tape service provider" as any person engaged in the "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]" *Id* § 2710(a)(4). Personally identifiable information "includes information which identifies a person as having requested or obtained specific video materials or services[.]" *Id* § 2710(a)(3). A "consumer" is "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" *Id* § 2710(a)(1).

Remedies under the Video Privacy Act are robust. For "any act" in violation of the law, 18 U.S.C. § 2710(c)(l), a court may award actual damages "not less" than $2,500, punitive damages, attorneys' fees, and equitable relief, *id* § 2710(c)(2). [1]

[1] Although located in Title Eighteen of the United States Code, the Video Privacy Act creates only civil, not criminal, liability. 18 U.S.C. § 2710(c).

Lastly, the Video Privacy Act allows a video tape service provider to disclose personally identifiable information only if it first obtains the consumer's "informed, written consent[.]" 18 U.S.C. § 2710(b)(2)(B). The Act was amended in 2013 to allow consent "through an electronic means using the Internet" for up to "2 years or until consent is withdrawn by the consumer[.]" *Id.* § 2710(b)(2)(B), (ii)(II); *see* Video Privacy Protection Act Amendments Act of 2012, Pub. L. No. 112-258, 126 Stat. 2414 (2013).

**B**

**1**

Washington Newspaper Publishing Company ("Washington Newspaper") owns the *Washington Examiner*, a news publication that has both print and online offerings.

Ms. Pileggi is an Illinois resident who regularly visits the *Washington Examiner*'s website. According to her complaint, she began receiving the *Washington Examiner'*s email newsletter after she provided it with her name and contact information. The newsletters she has received have embedded news videos and hyperlinks to the *Washington Examiner'*s website. Ms. Pileggi, though, does not allege that she ever visited the *Washington Examiner'*s website by way of a link in her newsletter.

According to Ms. Pileggi, the *Washington Examiner'*s webpages automatically played videos when the webpages loaded. Access to the webpages was not restricted to newsletter recipients. Anyone who wanted to visit the *Washington Examiner'*s website and watch the videos could do so regardless of whether that person also received the email newsletter. Ms. Pileggi says that, wholly apart from the newsletter, she independently navigated to the *Washington Examiner'*s website and watched videos there.

Ms. Pileggi maintains that the *Washington Examiner's* website contains the "Meta Pixel," a "snippet of code that, when embedded on a third-party website, tracks users[ ]" and information about their use of the website. Am. Compl. ¶ 46. The Meta Pixel then transmits information to Meta (Facebook's owner) to help Washington Newspaper target advertisements at Facebook users like Ms. Pileggi. That information details, among other things, which videos a person watched while visiting the website. The Meta Pixel also identifies website visitors by matching their IP addresses and other data to information associated with their Facebook accounts. Ms. Pileggi does not allege that the Meta Pixel was embedded in the email newsletters or that any information about any videos she watched in the newsletters was transmitted to Meta.

**2**

Ms. Pileggi sued Washington Newspaper under the Video Privacy Act in the United States District Court for the District of Columbia. Her complaint alleges that the company transmitted information about the videos she watched to Meta without her consent.

**\*3** The district court dismissed Ms. Pileggi's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Pileggi v. Washington Newspaper Publishing Co.,* No. 23-CV-345, 2024 WL 324121, at \*11 (D.D.C. Jan. 29, 2024). The court held that a plaintiff must purchase, rent, or subscribe to a video or similar audio-visual material to be a "consumer" under the Video Privacy Act. *Id* at \*10-11. The court also held that the personally identifiable information protected by the Act must concern the video that the plaintiff purchased, rented, or subscribed to. *Id.* Because the only information transmitted to Meta concerned the videos that Ms. Pileggi watched on the website, not the videos embedded in the newsletters, and because the newsletters were not the means by which Ms. Pileggi accessed the videos on the website, the court held that Ms. Pileggi was not a consumer under the Act. *Id.*

**II**

**A**

This court reviews *de novo* a district court's decision granting a motion to dismiss for failure to state a claim. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612,619 (D.C. Cir. 2023). In doing so, the court takes as true the complaint's plausible factual allegations and all reasonable inferences from those facts. *Id.*

**B**

The district court had jurisdiction under 28 U.S.C. § 1331. This court has jurisdiction under 28 U.S.C. § 1291.

The district court ruled that Ms. Pileggi has standing, *Pileggi,* 2024 WL 324121, at \*4-8, and Washington Newspaper does not contest her standing on appeal. Nonetheless, "we have an independent obligation to assure ourselves of our jurisdiction." *Sierra Club v. Department of Transp.*, 125 F.4th 1170, 1179 (D.C. Cir. 2025) (quoting *Waterkeeper Alliance, Inc. v. Regan*, 41 F.4th 654, 659 (D.C. Cir. 2022)). To demonstrate standing, a plaintiff must show that (1) she "suffered an injury in fact that is concrete, particularized, and actual or imminent"; (2) "the injury was likely caused by the defendant"; and (3) "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021).

Ms. Pileggi has shown standing because the harm she alleges----having one's private video viewing history given to another without consent-is analogous to two types of privacy harms cognizable at common law. In addition, this harm is traceable to Washington Newspaper and could be remedied by the court.

**1**

To satisfy Article III, the intrusion on Ms. Pileggi's privacy must be, among other things, a "concrete" injury. Whether an injury is "concrete" does not turn on whether the injury is tangible or intangible. *Spokeo, Inc. v. Robins,* 578 U.S. 330, 340-341, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016), *as revised* (May 24, 2016). Instead, for Article III purposes, an injury is "concrete" if it is similar to a type of harm cognizable at common law. See *TransUnion,* 594 U.S. at 424, 141 S.Ct. 2190. Said another way, an injury is concrete if it has "a close historical or common-law analogue[.]" *Id.* As the word "analogue" indicates, Article III does not require "an exact duplicate in American history and tradition." *Id.* Rather, Article III looks for a "close relationship" between the harm remedied by courts in the past and the harm that the plaintiff wants remedied by a court today. *Id.* at 425, 141 S.Ct. 2190.

When assessing whether an alleged injury is historically analogous, congressional judgment matters but is not dispositive. *Spokeo,* 578 U.S. at 341, 136 S.Ct. 1540. In particular, Congress may elevate certain harms "to the status of legally cognizable injuries" that "were previously inadequate in law." *TransUnion,* 594 U.S. at 425-426, 141 S.Ct. 2190 (quoting *Spokeo,* 578 U.S. at 341, 136 S.Ct. 1540).

One way Congress can render a traditionally non-cognizable injury concrete is by giving legal effect to "chains of causation that will give rise to a case or controversy where none existed before." *Spokeo,* 578 U.S. at 341, 136 S.Ct. 1540 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 580, 112 S.Ct.

2130, 119 L.Ed.2d 351 (1992) (Kennedy, J., concurring in part and concurring in the judgment)). For example, a harm like global warming would generally be non-cognizable given the many causal links involved were it not for congressional recognition of that harm, as the Supreme Court concluded in *Massachusetts v. EPA*, 549 U.S. 497, 516, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). The same is true for suits against corporations that do not use forced labor, but conduct business with companies that do. *See Doe 1 v. Apple Inc.*, 96 F.4th 403, 409 (D.C. Cir. 2024). In each instance, the defendant is only liable because Congress determined that liability should extend further back on the causal chain than the common law would otherwise allow.

**\*4** Another way Congress can render a non-cognizable injury concrete is by providing a private right of action to remedy a harm that is a lesser form of a harm recognized at common law. For example, to prove defamation under the common law, a plaintiff must show that the information told to others about her is false. RESTATEMENT(SECOND) OF TORTS § 558(A.L.1. 1977) ("SECOND RESTATEMENT"). It is not enough to prove that the information is misleading. Yet Congress can render concrete the lesser harm of defamation through misleading information by creating a private right of action to remedy that injury. *TransUnion*, 594 U.S. at 433, 141 S.Ct. 2190.

Similarly, a fleeting disturbance of one's peace and quiet by a single telephone call may be insufficient to sustain a common law claim for intrusion upon seclusion. SECOND RESTATEMENT § 652B cmt. d. But courts have concluded that Congress may render uninvited, unwanted, and intrusive text messages or phone calls a concrete harm by enacting a private right of action. *See Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 462 (7th Cir. 2020); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021). So long as Congress alters the degree of harm and not the kind of harm, congressional action can make an injury concrete.

### 2

Applying those principles here, having one's private viewing history provided without consent to a third party is a concrete injury. *Salazar v. National Basketball Ass'n,* 118 F.4th 533, 540-544 (2d Cir. 2024); *Salazar v. Paramount Global,* 133 F.4th 642, 647 (6th Cir. 2025); *Eichenberger v. ESPN, Inc.,* 876 F.3d 979, 982-984 (9th Cir. 2017); *Perry v. Cable News Network, Inc.,* 854 F.3d 1336, 1339-1341 (11th Cir. 2017).[2]

[2] Since Peny, the Eleventh Circuit has ruled *en banc* that plaintiffs must demonstrate an exact match between the elements of their private cause of action and a common law claim to demonstrate that their injury is concrete. *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1245-1246 (11th Cir. 2022) (en bane). We do not agree that a plaintiff must "plead every element of a common-law analog to satisfy the concreteness requirement." *National Basketball Ass'n*, 118 F.4th at 542 n.6; *see Barclift v. Keystone Credit Sens., LLC*, 93 F.4th 136, 145 (3d Cir.) ("We believe that if the Court wanted us to compare elements, it would have simply said so."), *cert. denied*, ––– U.S. ––––, 145 S. Ct. 169, ––– L.Ed.2d ––– (2024); *Shields v. Professional Bureau of Collections of Maryland, Inc.*, 55 F.4th 823, 829 (10th Cir. 2022) (holding that the plaintiff need not "plead and prove the tort's elements to prevail").

Ms. Pileggi asserts a violation of her right to privacy under the Video Privacy Act concerning her personal decisions about what to watch and not to watch. Washington Newspaper violated that right, Ms. Pileggi asserts, by transmitting her video-viewing history to Meta without her knowledge or consent. Am. Compl. ¶ 20.

An individual's choices about media consumption can communicate sensitive and historically private interests. For example, viewing history can indicate religious beliefs, personal interests, sexual preferences, medical concerns, relationship problems, obsessions, phobias, prejudices, or political likes and dislikes. Because the unconsented-to and unknowing disclosure of such personal information corresponds to the common law torts of "intrusion upon seclusion" and "disclosure of private information," *TransUnion*, 594 U.S. at 425, 141 S.Ct. 2190, Ms. Pileggi's asserted injury is concrete.

### a

Ms. Pileggi's injury is closely analogous to the harm of intrusion upon seclusion. *See Eichenberger*, 876 F.3d at 983; *Perry*, 854 F.3d at 1341; *Paramount Global*, 133 F.4th at 647 & n.4. Traditionally, "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability

to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." SECOND RESTATEMENT § 652B. "The invasion may be by *** investigation or examination into his private concerns, as by opening his private and personal mail[.]" *Id*. § 625B cmt. b. "[I]nvasion of privacy *** does not depend upon any publicity given to the person whose interest is invaded or to his affairs." *Id*. § 652B cmt. a

**\*5** The Video Privacy Act remedies the kind of harm addressed by the intrusion-upon-seclusion tort. The complaint alleges that Washington Newspaper intruded upon Ms. Pileggi's seclusion by disclosing her private video viewing history to a third party (Meta) without her knowledge or consent. Such an intrusion is offensive to a reasonable person. It is as if a magazine seller nosed around in someone's mailbox to learn what periodicals to press the owner to buy. *Cf. Stanley v. Georgia,* 394 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (recognizing an individual's "right to read or observe what he pleases-the right to satisfy his intellectual and emotional needs in the privacy of his own home"; "He is asserting the right to be free from state inquiry into the contents of his library."); *see Judiciary Hearing* at 2820-2821 (statement of Sen. Leahy) ("It is nobody's business what [someone] * * * watch[es] on television. * * * [T]hat is something that is not a conservative or a liberal or moderate issue. It is an issue that goes to the deepest yearnings of all Americans[.]"); *see also* Mary Madden & Lee Rainie, Pew Research Center, *Americans' Attitudes About Privacy, Security and Surveillance* 42-43 (May 20, 2015), https://perma.cc/7RY7-B2HV (finding that 44% of Americans think "online video sites" "shouldn't save *any* information" about the videos they watch) (emphasis added).

Historically, intrusion upon seclusion only gives a plaintiff the right to sue the party that intruded upon her seclusion. Yet Ms. Pileggi is suing Washington Newspaper, not Meta, even though Meta was the entity that Ms. Pileggi did not consent to receiving her video viewing records. But that makes no difference as to the concreteness of her injury. Washington Newspaper allegedly collected and handed off Ms. Pileggi's private information to Meta for its own benefit. Holding a party liable for contributing to a tort is a well-established common law principle. *See*SECOND RESTATEMENT § 876. And Congress may render liable the party that made the privacy intrusion possible. *See Spokeo,* 578 U.S. at 341, 136 S.Ct. 1540. As alleged, Washington Newspaper effectively "aided and abetted" Meta's intrusion upon Ms. Pileggi's private affairs by giving Meta access to her private information without her consent.

As for whether the disclosure of private video records is "*highly*" offensive," SECOND RESTATEMENT § 652B, that question goes to the degree of harm, not the injury's recognition at common law, and so does not affect the concreteness of the Video Privacy Act injury under Article III. *See Melito v. Experian Mktg. Solutions, Inc.,* 923 F.3d 85, 93 (2d Cir. 2019); *Susinno v. Work Out World Inc.,* 862 F.3d 346, 351-352 (3d Cir. 2017); *Krakauer v. Dish Network, L.L.C.,* 925 F.3d 643,653 (4th Cir. 2019); *Gadelhak,* 950 F.3d at 462-463; *Ward v. NPAS, Inc.,* 63 F.4th 576, 581 (6th Cir. 2023); *Van Patten v. Vertical Fitness Group, LLC,* 847 F.3d 1037, 1043 (9th Cir. 2017); *Lupia,* 8 F.4th at 1192; *Drazen v. Pinto,* 74 F.4th 1336, 1344 (11th Cir. 2023) (en banc). As the adverb "highly " suggests, the offensiveness inquiry involves drawing lines between intrusions upon seclusion that are severe enough to warrant liability and those that are insufficient. Although the Constitution limits Congress to the kinds of harm that lead to liability at common law, drawing lines between degrees of harm implicates policy judgments that fall more naturally in Congress's wheelhouse. *See TransUnion,* 594 U.S. at 425, 141 S.Ct. 2190. Because the disclosure of private video records parallels the offensive intrusions into privacy recognized at common law, Congress here simply gave protection to a common law injury cloaked in more modern garb.

b

Ms. Pileggi's claim also parallels the longstanding tort of publicity given to private life. At common law, "[o]ne who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." SECOND RESTATEMENT § 652D. Publicity "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id*. § 652D cmt. a. The Washington Newspaper's alleged disclosure of video records to Meta corresponds to those elements.

**\*6** *First,* as already discussed, the disclosure of Ms. Pileggi's video viewing records is highly offensive to a

reasonable person. Handing out a person's individual viewing preferences to others without their knowledge or consent can reveal intimate facts about that person's life, putting their likes and dislikes on display.

Keep in mind that Meta did not simply store Ms. Pileggi's private information in a "desk drawer." *TransUnion,* 594 U.S. at 434, 141 S.Ct. 2190. Washington Newspaper gave the information to Meta, which used the information to help Washington Newspaper target Ms. Pileggi with unwanted advertisements. Am. Compl. ¶¶ 53-58. If Washington Newspaper had sent Ms. Pileggi's video viewing history to a stranger, and that stranger repeatedly approached Ms. Pileggi asking her to buy things based on the videos she had viewed, most would agree that Ms. Pileggi's privacy had been invaded.

To be sure, Ms. Pileggi does not claim to have suffered public stigma or embarrassment because of the disclosure, which are harms that not uncommonly accompany the publicity of private life injury. But stigma and embarrassment are not elements of the tort. And Ms. Pileggi suffered analogous hurt because of the loss of control over what, at bottom, is *her* private and personal information, as well as a loss of security from being spied on and having private and sensitive information unwillingly transmitted to a stranger for profit. Am. Compl. ¶¶ 40-51.

In short, the form in which an injury may manifest does not change the fact of the common law injury itself-namely, the unconsented prying into private details. While embarrassment and stigma may increase the damages recoverable for the violation, that does not mean that more modern types of intrusion on privacy are any less injurious. After all, Judge Bork's penchant for Alfred Hitchcock films was hardly embarrassing or stigmatizing. *See Dolan, The Bork Tapes.* That did not diminish the broad social judgment that his privacy had been intruded upon.

*Second,* Ms. Pileggi's video viewing history is not of any legitimate concern to the public, and Washington Newspaper does not argue otherwise.

*Third,* that leaves the element of publicity. *Some* circuits have held that a plaintiff only suffers the kind of harm remedied by the publicity of private life tort if the plaintiff's private information is disclosed to the public at large. *See Nabozny v. Optio Solutions LLC,* 84 F.4th 731, 736 (7th Cir. 2023); *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.,* 48 F.4th 1236, 1246 (11th Cir. 2022) (en banc); *Shields v. Professional Bureau of Collections of Maryland, Inc.,* 55 F.4th 823, 829 (10th Cir. 2022).

The complaint alleges, though, that Meta commonly provides or sells the data it collects to third parties, which may *well amount to public release. See* Am. Compl. ¶ 50 (noting that Meta tends to sell video viewing data that it receives through the Meta Pixel).

Plus, even if Meta is treated as a private individual who is unlikely to disclose Ms. Pileggi's viewing records to anyone else, the kind of harm protected and remedied by the tort is the disclosure of one's private information without consent. *See National Basketball Ass'n,* 118 F.4th at 541-542 (holding that "unauthorized" disclosure is analogous to the common law tort). After all, the injury arising from a disclosure of private video viewing records to someone like a family member could exceed that from disclosure of private information to disinterested members of the public. Congress's adjustment of how and to how many people a disclosure of private information must be made for the disclosure to be wrongful simply recognizes a remediable injury that captures further degrees of common law harm. That falls within Congress's constitutional bailiwick. *TransUnion,* 594 U.S. at 425-426, 141 S.Ct. 2190.

**\*7** *Finally,* "[m]any American courts did not traditionally recognize intra-company disclosures" or disclosures to "vendors" that were paid to handle private information as privacy harms. *TransUnion,* 594 U.S. at 434 n.6, 141 S.Ct. 2190; *see also Barclift v. Keystone Credit Servs., LLC,* 93 F.4th 136, 146 (3d Cir.) (a disclosure to an "intermediary" is not sufficiently concrete), *cert. denied,*––– U.S. ––––, 145 S. Ct. 169, ––– L.Ed.2d ––– (2024); *Nabozny,* 84 F.4th at 736 (same).

But that line of cases has no bearing here because Meta did not act as an intermediary in this case, and Washington Newspaper has never suggested otherwise. *See National Basketball Ass'n,* 118 F.4th at 543 ("Meta isn't a 'ministerial intermediary,' " and "Meta's use of the disclosed data is very different" from that of an intermediary.). Unlike the employees of a credit reporting agency, *TransUnion,* 594 U.S. at 434 n.6, 141 S.Ct. 2190, or a mailing company that distributes debt letters, *Shields,* 55 F.4th at 826-827, Meta was the intended *recipient* of Ms. Pileggi's private information. Meta agreed with Washington Newspaper to track Ms. Pileggi's video viewing records and match that information with her Facebook data so that Washington

Newspaper could send her targeted advertisements, and so that Meta could further use that information for its own commercial purposes. Am. Compl. ¶¶ 50-58. So Meta did not simply convey information between parties. Meta and Washington Newspaper exchanged information about Ms. Pileggi because knowing what videos Ms. Pileggi (and others) watch is valuable to both of them.

### 3

In sum, Ms. Pileggi's injury is concrete twice over because it is closely analogous to harms remedied by two different common law torts. Ms. Pileggi also adequately alleges that Washington Newspaper caused that harm by transmitting her video viewing history to Meta without her consent. And that intrusion on privacy is judicially remediable through damages. For those reasons, Ms. Pileggi has shown standing.

## III

The Video Privacy Act protects the privacy of those who rent, purchase, or subscribe to a video cassette tape or similar audio-visual material. A plaintiff has a cause of action if private information about the video or similar audio-visual material that she rented, purchased, or subscribed to is disclosed to a third party without consent. 18 U.S.C. § 271O(b).

Although Ms. Pileggi received videos and video links from Washington Newspaper in a newsletter email for which she registered, the complaint does not allege that Washington Newspaper collected or transmitted information about her viewing of any newsletter videos. Instead, Ms. Pileggi's claims focus exclusively on the transmittal of information to Meta about videos Ms. Pileggi watched on the *Washington Examiner*'s website, separate and apart from the newsletter. But Ms. Pileggi did not rent, purchase, or subscribe to the videos on the website. So Ms. Pileggi has not stated a claim against Washington Newspaper under the Video Privacy Act.

### A

Ms. Pileggi's primary argument on appeal is that a plaintiff need not subscribe to a video good or service to be a consumer under the Video Privacy Act. Ms. Pileggi did not present this argument to the district court. Ordinarily, that would result in forfeiture. *Keepseagle v. Perdue,* 856 F.3d 1039, 1053 (D.C. Cir. 2017).

**\*8** Forfeiture, however, "does not apply where 'the district court nevertheless' heard and 'addressed the merits of the issue.' " *Campaign Legal Center v. Federal Election Comm'n,* 106 F.4th 1175, 1190 (D.C. Cir. 2024) (quoting *Blackmon-Malloy v. United States Capitol Police Bd.,* 575 F.3d 699, 707 (D.C. Cir. 2009)). Here, the district court held that Ms. Pileggi failed to state a claim because the statute requires the consumer to purchase, rent, or subscribe to "audio-visual goods or services," and the information transmitted to a third party must concern the audio-visual goods or services that the plaintiff acquired to violate the Video Privacy Act. *Pileggi,* 2024 WL 324121, at *11. The district court's premise that the goods or services must be audio-visual goods or services was a stated basis for the district court's holding. For that reason, Ms. Pileggi may challenge it on appeal.

### B

The district court was correct that Ms. Pileggi is not a "consumer" protected by the Video Privacy Act because, in visiting the *Washington Examiner's* website, she did not subscribe to a video or similar audio-visual good or service. As a result, Washington Newspaper did not violate the Video Privacy Act when it gathered information about her viewing history on the website and gave it to Meta.

### 1

The Video Privacy Act's cause of action applies to "consumer[s]" whose viewing histories have been disclosed without their consent. 18 U.S.C § 2710(b)(1). And only those who rent, purchase, or subscribe to a video are "consumer[s]" under the statute. *Id.* § 2710(a)(1). As a result, there are five reasons why it is not enough, as Ms. Pileggi argues, just to obtain some other good or service furnished by a person who also happens to provide videos or audio-visual materials. Pileggi Br. 16-27; Pileggi Reply Br. 3-5.

*First,* the statutory text tells us that only a "consumer" has a cause of action under the Video Privacy Act. 18 U.S.C. § 2710(b)(l). The Act defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" *Id* § 2710(a)(l). *A* video tape service provider is a person who supplies "video cassette

tapes or similar audio visual materials[.]" *Id.* § 2710(a)(4). Putting the words together, a "consumer" of a "video tape service provider" is someone who "rent[s], purchase[s], or subscribe[s]" to the "good or service" that a "video tape service provider" offers-that is, "video cassette tapes or similar audio visual materials." *Id* § 2710(a).

*Second,* "useful clue[s]" in the statute and its structure, Dubin v. United States, 599 U.S. 110, 121, 143 S.Ct. 1557, 216 L.Ed.2d 136 (2023), confirm that to be a "consumer," the plaintiff must have obtained a "video or audio visual service" from the defendant, and not just any good or service.

To start, "the title of a statute and the heading of a section" can help determine a statute's "meaning." Dubin, 599 U.S. at 120-121, 143 S.Ct. 1557 (quoting Almendarez-Torres v. United States, 523 U.S. 224, 234, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)); see also United States v. Burwell, 122 F.4th 984, 991 (D.C. Cir. 2024); Huisha-Huisha v. Mayorkas, 27 F.4th 718, 727 (D.C. Cir. 2022). Here, the statute's title and the liability section's heading "point to a narrow[ ] reading" that is "centered around" videos and those who market them. Dubin, 599 U.S. at 120, 143 S.Ct. 1557. After all, Congress named the law the *"Video* Privacy Protection Act of 1988." Pub. L. No. 100-618, § 1, 102 Stat. 3195 (1988) (emphasis added). The Act's title is "Wrongful disclosure of *video* tape rental or sale records." 18 U.S.C. § 2710 (emphasis added); *see* Pub. L. No. 100-618, § 2, 102 Stat. at 3195. And the liability section's heading is *"Video* Tape Rental and Sale Records." 18 U.S.C. § 2710(b) (emphasis added); *see* Pub. L. No. 100-618, § 2, 102 Stat. at 3195.

 *9  A statute's title "is 'especially valuable [when] it reinforces what the text's nouns *** independently suggest." Dubin, 599 U.S. at 121, 143 S.Ct. 1557 (quoting Yates v. United States, 574 U.S. 528, 552, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015) (Alito, J., concurring in judgment)). Here, the noun "video" suffuses the statute, independently indicating that the relevant good that a consumer subscribes to must be a video, not just any good or service provided by someone who also happens to offer video or audio-visual services.

For example, the "personally identifiable information" protected by the Act refers to information that "identifies a person as having requested or obtained specific *video* materials*[.]*" 18 U.S.C. § 2710(a)(3) (emphasis added). A "*video tape service provider*" distributes "video cassette tapes or similar audio visual materials[.]" *Id.* § 2710(a)(4) (emphases added). And no liability attaches if the information disclosed does not identify the "title, description, or subject matter of any video tapes or other audio visual material" acquired by a consumer. *Id.* § 2710(b)(2)(D)(ii) (emphasis added).

*Third*, the statute's substantial penalty provision weighs in favor of enforcing the textual linkage between a consumer and a video. The statute provides that "[a]ny person aggrieved by any act"-note the singular "act"-"in violation of this section may bring a civil action[.]" 18 U.S.C. § 2710(c)(1). And the penalty for each and every single "act" in violation of the statute: "[N]ot less than liquidated damages in an amount of $2,500[.]" *Id.* § 2710(c)(2)(A).

So each time a defendant transmits information about a single video that one plaintiff watched to a single third party, the court *must* award *at least* $2,500, even if the plaintiff's actual damages are less. 18 U.S.C. § 2710(2)(A). This means that a defendant with a website that has 100 visitors who watch five videos apiece would be liable for at least $1.25 million in damages if it disclosed their video choices. The statutory text and purpose demonstrate Congress's desire to protect consumers of actual video services with such remedies. But the stringency of the remedy weighs against judicial expansion of the text to cover harms further removed from commerce in videos or similar audio-visual services.

*Fourth*, the Video Privacy Act's authorization of punitive damages, 18 U.S.C. § 2710(c)(2)(8), requires that the statutory text be construed against the expansive liability that Ms. Pileggi proposes. The Act's punitive damages are "intended to punish the defendant and to deter future wrongdoing[,]" not to make the plaintiff whole. Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). Liability provisions in statutes with civil penalties that punish and deter must be construed narrowly, ensuring fair notice to regulated parties. *Cf.* Bittner v. United States, 598 U.S. 85, 102, 143 S.Ct. 713, 215 L.Ed.2d 1 (2023) ("The law is settled that *penal statutes* are to be construed strictly[.]") (quoting Commissioner v. Acker, 361 U.S. 87, 91, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959)).

*Finally,* the Video Privacy Act could not effectively serve its purpose of insulating video-viewing records from disclosure if Ms. Pileggi's view prevailed. If acquiring any good or service sufficed to convey a cause of action with such expansive remedies, a plaintiff could purchase a single ticket at a baseball game and then sue the baseball team's owner

after watching a free video on the team's website years later. Simply "purchas[ing]" a "good[ ] or service[ ]" in the form of a ticket would entitle people not to have their separate website visits tracked. 18 U.S.C. § 2710(a)(l). At the same time, those who just visit the website without first buying a ticket or another good or service would not enjoy the Video Privacy Act's protections, even though their video-viewing history would be tracked in the exact same manner as that of the ticket purchaser. Nothing in the Act's language, structure, or purpose warrants such haphazard and unreasoned line-drawing.

 *10  In fact, distinguishing website visitors based on whether they also happened to purchase another good or service offered by the business could well prove unadministrable. By creating liability only for the transmission of a consumer's personally identifiable video information, the statute presumes that video tape service providers know whether someone is a "consumer" of their goods or services. But if *any* good or service suffices to make someone a statutorily protected consumer, a video tape service provider would have to determine and differentiate between those who just visit the website and those who visit the website after having at some unknown prior time purchased some different good or service. That would be a daunting task under any circumstances. Doubly so because usernames employed by those visiting websites do not always, or even often, match credit or debit card names. See Mary Madden, Pew Research Center, *Public Perceptions of Privacy and Security in the Post-Snowden Era* 41 (Nov. 12 2014), https://perma.cc/TIJM9-B74B (finding that 42% of Americans report accessing websites with an anonymous username). And those buying tickets with cash will leave the provider no ability to carve their website traffic out from that of others. *See Utility Air Regulatory Group v. EPA*, 573 U.S. 302,320, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014) (courts should not read statutes to be "unworkable").

At the end of the day, under Ms. Pileggi's position, video tape service providers would just have to assume that all visitors to their websites are consumers. But that interpretation would leave the term "consumer" "no work to do" in the statute. *Fischer v. United States*, 603 U.S. 480,490, 144 S.Ct. 2176, 219 L.Ed.2d 911 (2024); *see also Pulsifer v. United States*, 601 U.S. 124, 143, 144 S.Ct. 718, 218 L.Ed.2d 77 (2024) (rejecting an interpretation that rendered "an entire subparagraph meaningless") (quoting *National Ass'n of Mfrs. v. Department of Defense*, 583 U.S. 109,128, 138 S.Ct. 617, 199 L.Ed.2d 501 (2018)).[3]

3   The Video Privacy Act's consent provision insulates video tape service providers from liability for disclosures if they obtain the consumer's "informed, written consent" in advance. 18 U.S.C. § 2710(b)(2); *see id.*§ 2710(b)(2)(B), (b)(2)(B)(ii)(II) & (iii). While the consent provision may be workable for customers directly acquiring videos, the statutory text does not suggest that Congress meant to require every video tape service provider to obtain a waiver from every t-shirt purchaser on the chance that the same person might sometime in the ensuing years visit the business's website and watch a video on it.

*2*

Ms. Pileggi argues that the statutory text indicates that a person need not purchase, rent, or subscribe to a video good or service to be a "consumer" under the Video Privacy Act. She relies on the meaningful-variation canon of statutory construction. That canon reasons that if "[a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea[.]" *Southwest Airlines Co. v. Saxon,* 596 U.S. 450, 458, 142 S.Ct. 1783, 213 L.Ed.2d 27 (2022) (first alteration in original) (quoting A. SCALIA & B. GARNER, READING LAW 170 (2012)). Specifically, Ms. Pileggi points out that, in defining "consumer," Congress omitted the adjective "video" before the phrase "goods or services[.]" 18 U.S.C. § 2710(a)(l). Yet in defining "personally identifiable information," the word "video" appears before the words "materials or services[.]" *Id* § 2710(a)(3). From that comparison, Ms. Pileggi concludes that the Act focuses the cause of action on a specific kind of harm-the transmittal of video viewing records-regardless of whether the product consumed was a video.

The point of statutory canons, however, is to aid in resolving ambiguous statutory terms or phrases, not to cause a court to miss the forest for a single tree.

To start, Ms. Pileggi's argument disregards the rest of the sentence. The definition of "consumer" in full is:

any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]

18 U.S.C. § 2710(a)(1).

Read as a whole, there is no meaningful or material change in textual focus. Congress confined a "consumer" protected by the Video Privacy Act to someone who is a "renter, purchaser, or subscriber of goods or services" that come "*from* a *video tape service provider.*" 18 U.S.C. § 2710(a)(l) (emphasis added). The logical meaning of the sentence as a whole is that a consumer is a person who obtains the products or services that one seeks from a video tape service provider-that is, videos. See *Paramount Global,* 133 F.4th at 650 (The definition of video tape service provider is "tether[ed] [to] the definition of 'consumer' " and "pinpoints the relevant 'goods or services[.f"). After all, if Congress sought to protect the consumers of "goods or services from a medical provider," the natural reading would be that consumers are those who received medical services, not those who only bought a coffee in the foyer. The named source "from" which the product must derive gives meaning to the scope of the regulated goods and services.

**\*11** To that point, the Supreme Court has been explicit that the word " 'from' necessity draws its meaning from context," *County of Maui v. Hawaii Wildlife Fund,* 590 U.S. 165, 178, 140 S.Ct. 1462, 206 L.Ed.2d 640 (2020), and that "context often imposes limitations" on what a phrase beginning with "from" means, *id.* at 172, 140 S.Ct. 1462. See also *National Ass'n of Clean Water Agencies v. EPA,* 734 F.3d 1115, 1128 (D.C. Cir. 2013) ("[F]rom' is susceptible to different meanings" and requires statutory context to interpret.).

To illustrate, in *County of Maui,* the Supreme Court relied on context to interpret the word "from" in a definitional phrase in the Clean Water Act. 590 U.S. at 172, 140 S.Ct. 1462. The statute defines the term "discharge of a pollutant" as the "addition of any pollutant to navigable waters *from* any point source[.]" 33 U.S.C. § 1362(12) (emphasis added). The Court relied on context to reject the plaintiff's broad interpretation that no matter how "long and far" a pollutant traveled before reaching a navigable water, a pollutant was "from" a point source if it could be traced to that source. *County of Maui,* 590 U.S. at 173, 183, 140 S.Ct. 1462. Because the plaintiff's interpretation would extend the Act's coverage broadly when the statute's structure evinced Congress's more narrow regulatory purpose, the Court read the definitional "from" phrase as limiting, not broadening, the defined statutory term. *Id* at 174-176, 140 S.Ct. 1462.

Like the plaintiff in *County of Maui,* Ms. Pileggi's interpretation of the Video Privacy Act uses the "from" phrase in the definition of "consumer" to broaden the statute beyond what the statutory structure and purpose can support. See *Jarecki v. G. D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961) (Courts must "avoid" giving "unintended breadth to the Acts of Congress[.]"). Here, given that the term "video" already appears in the title, five times in the definitional section, and thirteen times in the statute as a whole-and keeping in mind the statute's animating purpose-Congress could reasonably have assumed that its regulatory focus was clear. The placement of "video" at the end rather than the beginning of the definition of "consumer" is a frail excuse for reading the Video Privacy Act to reach far beyond its textual "metes and bounds[.]" *United States v. Aguilar,* 515 U.S. 593, 599, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995).

Another flaw in Ms. Pileggi's reading is that courts cannot put undue weight on a single omission of a word. Instead, courts must adopt "the reading to which 'the provisions of the whole law' point." *Thaler v. Perlmutter,* 130 F.4th 1039, 1046 (D.C. Cir. 2025) (quoting *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,* 510 U.S. 86, 94, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993)).

Here, too many statutory provisions cut against Ms. Pileggi's siloed reading of one part of one definitional prov1s1on. Her argument once again takes no account of the Video Privacy Act's name, Pub. L. No. 100-618, § 1, 102 Stat. 3195 (1988), its title, 18 U.S.C. § 2710, the definition of personally identifiable information, *id.* § 2710(a)(3), the definition of video tape service provider, *id.* § 2710(a)(4), the liability provision's title, *id.* § 2710(b), and the consent provision, *id.* § 2710(b)(2)(D). The focus on videos, video tape service providers, and the disclosure of information about video-viewing or purchasing history pervades the Video Privacy Act. That makes it both textually strained and logically improbable that Congress meant for an omitted adjective in the first half of the definition of "consumer" to transmogrify the Act into a much more sweeping and unadministrable website privacy statute that inexplicably turns on purchasing *something-anything-at* some however-distant point in time before viewing a video. See *Paramount Global,* 133 F.4th at

650 ("The statutory phrase 'goods or services' " in the Video Privacy Act cannot be walled "off from the meaning imputed by the rest of the statute's text."); *see also Gustafson v. Alloyd Co.,* 513 U.S. 561, 568, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (Courts must "construe statutes, not isolated provisions[.]"). In other words, in statutory construction as elsewhere, it is best not to let a canon's tail wag the dog.

**\*12** Ms. Pileggi argues that adopting her reading of "consumer" is necessary to avoid rendering the word "video" surplusage when it appears in the "personally identifiable information" definition. 18 U.S.C. § 2710(a)(3).

Not so. Congress had every reason to add "video" in front of "materials or services." In 1988, "personally identifiable information" referred broadly to things like names, addresses, social security numbers, and the like. *See* Cable Communications Policy Act of 1984, Pub. L. No. 98-549, § 63 l(a)(2), 98 Stat. 2779, 2794 (1984) (defining "personally identifiable information" as information that "identif[ies] particular persons"). So "video" was added to give the phrase "personally identifiable information" a specialized meaning in the Video Privacy Act that includes video-viewing choices. [4]

[4] This appeal does not present any question about the meaning of "personally identifiable information." *Cf. Solomon v. Flipps Media, Inc.,* 136 F.4th 41, 48-55 (2d Cir. 2025).

Anyhow, even if Ms. Pileggi's interpretation would prevent surplusage, the analysis would not change. The surplusage canon is a tool to effectuate congressional meaning, not to override contrary textual indicia. *See Lamie v. United States Trustee,* 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("[O]ur preference for avoiding surplusage constructions is not absolute."); *Chickasaw Nation v. United States,* 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001). [5]

[5] For these reasons, we read the statute differently from the Second and Seventh Circuits. *National Basketball Ass'n,* 118 F.4th at 550; *Gardner v. Me-TV National Ltd. Partnership,* 132 F.4th 1022, 1025 (7th Cir. 2025).

Ms. Pileggi offers one last argument for consumer status: She signed up for the *Washington Examiner's* email newsletter, which included embedded videos as well as links that connected to videos on the *Washington Examiner's* website.

But Ms. Pileggi does not allege that any of the videos in the newsletter contained the Meta Pixel that tracks viewing selections. Neither does she claim that Washington Newspaper tracked, let alone disclosed to a third party, any video viewing selections she made within the newsletter. *Pileggi,* 2024 WL 324121, at \*10. Nor does she claim that she clicked on any website links in the newsletter that took her to the *Washington Examiner's* website. Ms. Pileggi's complaint says only that she went to the *Washington Examiner's* website, independently of the newsletter, and while there, had her viewing information tracked and disclosed. Only those disclosures are the basis for her lawsuit. Am. Compl. ¶¶ 13-24.

Subscribing to an e-newsletter that includes videos and video links, by itself, is not enough to make someone a "consumer" under the Video Privacy Act. Instead, the videos for which viewing history is disclosed must be the same video materials or services that the individual purchased, rented, or subscribed to. Congress, in other words, did not protect every person who sees a video somehow. Only those who purchase, rent, or subscribe to a video service are protected, and it is only to those same videos that the statute's privacy protections attach. *See* 18 U.S.C. § 2710(a)(2), (a)(3) & (b). Because the newsletter in no way connected Ms. Pileggi to a relevant video, we have no opportunity to address what kinds of connections are required between a product like a newsletter and a video for a cause of action under the Video Privacy Act to arise.

C

**\*13** Washington Newspaper advances three additional arguments for why Ms. Pileggi has failed to state a claim: (1) Washington Newspaper is not a "video tape service provider" because its short online videos are not "similar" to the longer content of most video cassette tapes in 1988; (2) Ms. Pileggi is not a "subscriber" because she did not pay for the e-newsletter; and (3) Washington Newspaper did not knowingly disclose Ms. Pileggi's private information to Meta.

Because Ms. Pileggi's complaint does not plausibly allege that she is a "consumer" protected by the Video Privacy Act, the

district court properly dismissed the complaint for failure to state a claim. Given that, we need not address Washington Newspaper's additional arguments.

IV

For the foregoing reasons, the district court's judgment dismissing Ms. Pileggi's complaint for failure to state a claim is affirmed.

*So ordered.*

Randolph, Senior Circuit Judge, concurring:

The Video Privacy Protection Act, 18 U.S.C. § 2710, is a 1988 law "prohibit[ing] video stores" from divulging their customers' "video tape" viewing histories.[1] S. Rep. No. 100-599, at 6-7 (1988). The VPPA is expressly limited to "consumer[s]" of a "video tape service provider." 18 U.S.C. § 2710(b)(1). My colleagues hold that plaintiff Nicole Pileggi is not such a "consumer," and therefore cannot recover damages from the *Washington Examiner*. I join their opinion.

[1] As the majority notes, *see* Majority Op. ——, the VPPA was a response to an article in the City Paper summarizing then-Supreme Court nominee Judge Robert H. Bork's video tape rental history. The summary showed that Judge Bork had a weakness for Hitchcock movies and other classics. For a retrospective on the controversy by the reporter who first published Judge Bork's movie habits–and who claims he still has the full and unpublished movie list-see Michael Dolan, *Borking Around,* The New Republic (Dec. 20, 2012).

But there is also a straighter path to the same ultimate result: the *Washington Examiner* is not a "video tape service provider." Technology has overtaken this federal statute and has rendered it largely obsolete. The VPPA addressed a different problem in a different time. If the statute needs updating, that is Congress's work to do, not ours.

The VPPA imposes liability on "video tape service provider[s]," defined as businesses transacting in "prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). These terms are not further explained, but since the *Examiner's* short online videos are unambiguously not "prerecorded video cassette tapes," Pileggi can succeed only if the videos are "similar audio visual materials." And since the *Examiner's* videos are certainly "audio visual materials," the key question is whether they are "similar" to "prerecorded video cassette tapes."

"Similar" cannot mean "other." The VPPA's use of "similar" requires something more than a vague resemblance between the videos at issue in this case and a "prerecorded video cassette tape[ ]." *See, e.g., Similar,* Webster's New World Dictionary (3d ed. 1988) (defining "similar" as "nearly but not exactly the same or alike; having a resemblance"); *Similar,* Black's Law Dictionary (5th ed. 1979) (defining similar as "[n]early corresponding; resembling in many respects"). A related section of the VPPA, § 2710(b)(2)(D)(ii), highlights this difference. That section specifically limits the use of marketing data relating to *"any* video tapes or *other* audio visual material." *Id.* (emphasis added). Note the contrast between § 2710(b)(2)(D)(ii)'s expansive phraseology of "any" and "other," compared with § 2710(a)(4)'s more circumscribed language of "prerecorded video cassette tapes or similar audio visual materials." Had Congress also said *"other* audio visual materials" in § 2710(a)(4)*, id.* (emphasis added), "other" would serve as a catch-all for every potential type of video content. In that world, the *Examiner*'s video clips would be covered. But Congress did not enact that statute.

*14 Two years ago, the Supreme Court faced an analogous problem in *Delaware v. Pennsylvania,* 598 U.S. 115, 143 S.Ct. 696, 215 L.Ed.2d 24 (2023), a case about the meaning of the phrase "money order ... or other similar written instrument." *Id.* at 123, 143 S.Ct. 696 (emphasis added) (quoting 12 U.S.C. § 2503(1)). The unanimous Court "determine[d] what 'similar' entail[ed] in light of the [statute's] 'text and context,' not in the abstract." *Id.* (citation omitted) (second excerpt quoting *Sw. Airlines Co. v. Saxon,* 596 U.S. 450, 459, 142 S.Ct. 1783, 213 L.Ed.2d 27 (2022)). The Court then identified the relevant "text and context" by looking to the principal term ("money order"}-not Congress's catch-all language ("similar written instrument"}-and explained that "similar" was defined by reference to the "function and operation" of money orders. *Id.* at 128, 143 S.Ct. 696.

Applying that methodology to the VPPA, the *Examiner* is not a "video tape service provider." The "function and operation" of a "prerecorded video cassette tape[ ]" bear little similarity to those of a short online video clip. Pre-Internet users obtained a physical object when they purchased or rented a video cassette tape; modem audiences click on a link and

receive a stream of ones and zeros in response. The two formats *plainly do not "operate in the same manner." Id.* at 127, 143 S.Ct. 696. Moreover, the "function[s]" of a brief informational clip and a feature-length movie are entirely different. An online news clip and a VHS rental may both be videos at some high level of generality, but the VPPA's statutory language forecloses such a broad-brush approach.

Statutory context also weighs in favor of limiting the VPPA to physical materials. As the majority notes, "the heading of a section" can shed light on the "meaning" of a statute. Majority Op. —— (quoting *Dubin v. United States,* 599 U.S. 110, 121, 143 S.Ct. 1557, 216 L.Ed.2d 136 (2023)). The heading of § 2710 is "Wrongful disclosure of video tape rental or sale records"; likewise, the heading of § 2710(b) is "Video Tape Rental and Sale Records." While the majority emphasizes the word "video," these titles also demonstrate Congress's focus on "video tape[s]," tangible objects which can be "rent[ed]" or put up for "sale."

This reading is further supported by contemporaneous evidence from Congress. In the only discussion of the term "video tape service provider" anywhere in the legislative history, the VPPA's Senate committee report explains that the phrase encompasses "similar audio visual materials, *such as laser disks, open-reel movies. or CDI [compact disc] technology.*" S. Rep. No. 100-599, at 12 (emphasis added). All three listed examples of "similar" materials are physical objects: laser and compact discs encode data in an optical disc, and "open-reel movies" use magnetic tape for data storage. They are tangible objects which can be held, stored, rented, or sold. And that makes sense, because the VPPA was principally designed to target "video stores" like the one that leaked Judge Bork's rental history. *Id.* at 7.

Limiting "video tape service provider" in this fashion would avoid the parade of horribles the majority offers and would allay the majority's fear that the VPPA would sweep in all websites. *See* Majority Op. —— – ——. Unless those websites engage in the specific conduct at the heart of the VPPA-transactions in physical audio visual media-they face no risk of liability.

The Internet was in its infancy in 1988, and Congress would have needed remarkable oracular powers to have included language about online videos in the VPPA. Congress's failure to foresee technological change, however, is not a reason to extend the statute by judicial fiat. Instead, the proper inference is that "similar[ity]" to a "prerecorded video cassette tape[ ]" entails the type of audio visual materials that Congress did contemplate: physical data formats like cassette tapes, laser discs, compact discs, and magnetic tape machines. In today's digital world, those analog mediums have no analogue medium.

**All Citations**

--- F.4th ----, 2025 WL 2319550

---

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.